UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAIME NELSON-MOLNAR,
individually and as next friend of
J.W., a minor,

     Plaintiff,

v.

ANN ARBOR PUBLIC SCHOOLS,
MICHAEL JOHNSON in his official
capacity as Principal of Carpenter
Elementary School, and DURHAM
SCHOOL SERVICES LP, d/b/a/
DURHAM TRANSPORTATION,

Defendants.

Case No.

Hon.

---

Megan Bonanni (P52079)
Danielle Y. Canepa (P82237)
Beth Rivers (P33614)
PITT MCGEHEE PALMER BONANNI & RIVERS
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mbonanni@pittlawpc.com
dcanepa@pittlawpc.com
brivers@pittlawpc.com
*Attorneys for Plaintiff*

---

## COMPLAINT AND JURY DEMAND

Defendants created a dangerous environment in which Plaintiff J.W., a seven-year-old child who is autistic and severely emotionally impaired, was physically and verbally abused by a school bus aide for weeks. Surveillance footage of the abuse

was immediately available to Ann Arbor Public Schools and Durham Transportation, but for reasons unknown the footage was not reviewed for five weeks. During that time, J.W. was forced to face his abuser, who continued to taunt and physically abuse him.

For five weeks, Defendant Ann Arbor Public Schools, Defendant Carpenter Principal Michael Johnson, and Defendant Durham Transportation sent J.W. onto the bus and hid the fact that J.W. was assaulted by bus aide Rochanda Jefferson from J.W.'s mother, law enforcement, and Child Protective Services, contrary to mandatory documentation and reporting laws. In January 2023 the bus aide assaulted J.W. a second time. Video footage from the full five weeks may reveal that Jefferson physically abused J.W. on further occasions. Jefferson targeted J.W. because of his disability, believing she could discipline ordinary autistic behaviors out of him. Defendants ignored and concealed reports of the abuse from other children on the bus based on stereotypes that children with disabilities are "bad" kids who are unreliable and poorly behaved. AAPS, Johnson, and Durham placed every single child on the bus in danger each day Jefferson remained on the bus in December and January.

Nelson, still unaware of the assaults, continued to tell the school that her son was coming home from school highly distressed and that something was wrong. J.W. was increasingly tearful, agitated, and scared, especially in the afternoon before and

after he rode the bus. Finally, on January 19, 2022, after five weeks of hiding the first assault, Defendant Johnson admitted to Nelson that there had been two "incidents" on the bus. Defendants still resisted disclosing details and simply transferred Jefferson to another bus—placing more children in danger. Nelson only learned of the physical abuse through a teacher who broke ranks to tell the truth.

Nelson and J.W. have suffered significant emotional distress as a result of the abuse and the cover-up. J.W. has suffered behavioral regressions and struggles more than ever with physical contact. Jefferson, the bus aide, was subsequently criminally charged and found guilty of child abuse.

Defendants' actions violated J.W.'s constitutional rights to due process and bodily integrity and his numerous rights as a child with a disability, as protected by federal and state law. Nelson requests that Defendants provide medical treatment, educational intervention, repair their special education policies, and pay monetary damages as compensation for the harm they caused—by disregarding prior complaints about Jefferson and other bus aides, by knowingly maintaining dangerous policies and procedures, and by concealing Jefferson's initial verbal harassment and physical assault of J.W. from his mother and from law enforcement.

## PARTIES AND JURISDICTION

1.    Plaintiff J.W. ("J.W.") is a child living in Ann Arbor, Michigan. He was seven years old during all events detailed here.

2.      J.W. has been diagnosed as autistic and emotionally impaired. He receives ongoing treatment with a number of healthcare providers, including a psychiatrist and a social worker.

3.      Plaintiff Jaime Nelson-Molnar ("Nelson") is J.W.'s mother and was a single parent at the time of all relevant events. Nelson was herself a public school teacher for 19 years and is now an administrator in another school district.

4.      Defendant Ann Arbor Public Schools ("Ann Arbor Public Schools" or "AAPS") is a public school district operating in Washtenaw County, Michigan. It serves the city of Ann Arbor, Michigan and parts of eight surrounding townships covering 125 square miles.

5.      AAPS receives federal funding.

6.      "Student Intervention & Support Services" or "SISS" refers to the special education program in AAPS.

7.      Carpenter Elementary School is part of Ann Arbor Public Schools.

8.      Defendant Michael Johnson ("Johnson") is the Principal of Carpenter Elementary School. Johnson is a citizen of the State of Michigan and was acting under the color of state law and within the course and scope of his employment as Principal of Carpenter Elementary School in Ann Arbor Public Schools.

9.      Upon information and belief, Defendant Johnson was a final policymaker for Carpenter Elementary with regard to directing and controlling staff

conduct, staff training, investigating allegations of abuse, reporting the abuse to authorities, and concealing reports of abuse.

10.    Defendant Durham School Services LP, d/b/a Durham Transportation ("Durham") is a school bus operator based in Lisle, Illinois, and currently operating in 32 states, including Michigan.

11.    Defendant Ann Arbor Public Schools contracted with Defendant Durham to provide school bus services for children attending AAPS, including children in the District's special education programs.

12.    Durham was acting under color of state law at all relevant times by (a) providing a public service by operating school buses for a public school district, a function traditionally performed by public entities and (b) acting so closely with AAPS that Durham's staffing, training, and supervisory actions were the actions of AAPS, and (c) having a symbiotic relationship with AAPS in which AAPS administrators played a role in Durham's operations and decision-making, including staffing, training, and supervisory functions.

13.    Defendants Ann Arbor Public Schools and Durham were joint employers of school bus staff, including bus aides, because Ann Arbor Public Schools had the ability to train, direct, and supervise employees; the ability to hire, fire or discipline employees; the ability to affect their compensation and benefits, and to direct and supervise their performance.

14.     Proceeding as Next Friend on behalf of her son, J.W., a minor, Nelson asserts the following claims against Ann Arbor Public Schools, Principal Johnson in his official capacity, and Durham School Services LP, d/b/a Durham Transportation: violation of due process and the right to bodily integrity under the Fourteenth Amendment to the U.S. Constitution, as enforced under 42 U.S.C. § 1983; discrimination on the basis of disability under the Americans with Disabilities Act ("ADA"), 42 USC § 12101 et seq.; discrimination on the basis of disability under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794; discrimination on the basis of disability under the Michigan Persons with Disabilities Civil Rights Act ("PDCRA") MCL 37.1101, et seq.; failure to report child abuse in violation of the Michigan Child Protection Law, MCL 722.623 et seq.; and intentional infliction of emotional distress.

15.     Proceeding for herself, Nelson asserts claims against all Defendants for intentional infliction of emotional distress.

16.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 42 U.S.C. § 1983, 42 USC § 12101 et seq., and 29 U.S.C. § 794 et seq.

17.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 as those claims arise out of the same facts as the federal claims and all claims are part of the same case or controversy.

6

18.     Venue is proper in the Eastern District of Michigan, Southern Division as the events giving rise to this cause of action occurred in this district and division, Plaintiffs reside in this district, and Defendant Ann Arbor Public Schools, Defendant Johnson, and their agents operate exclusively in this district. 28 U.S.C. §1391(b).

## FACTS

### AAPS Invites J.W. to Attend Specialized Program at Carpenter

19.     In December 2021, J.W. joined the Emotionally Impaired Self-Contained Classroom ("EISCC") at Carpenter Elementary School.

20.     The EISCC at Carpenter is a dedicated special education classroom for children with emotional impairments provided by Ann Arbor Public Schools ("AAPS").  It is the most intensive special education classroom experience provided by AAPS. At that time, Carpenter Elementary was the only elementary school in AAPS that provided the EISCC program.  Only eight children in the school district participate in the program.

21.     AAPS recommended J.W. for the EISCC program in 2021 based on a finding that it was the least restrictive environment ("LRE") possible for him to receive a public education.

22.     Prior to joining the EISCC program at Carpenter Elementary, J.W. attended Lakewood Elementary.

23.     Teachers and administrators at Lakewood told Nelson that Lakewood teachers did not have relevant training to support a child with emotional impairments.

24.     AAPS agreed that Lakewood was not equipped to provide educational services to J.W. and recommended him for the EISCC program because staff would purportedly have appropriate training.

25.     On December 6, 2021, J.W. began his first day in the EISCC program at Carpenter. He was enrolled in the second grade.

26.      December 6th was also J.W.'s first day riding Bus 17, a vehicle designated for children participating in AAPS special education programs.

27.     J.W. had approximately three years of experience riding the bus with Ann Arbor Public Schools. He previously rode the bus in Preschool, Kindergarten, and, following an interruption during the pandemic, second grade.

28.     J.W. had never experienced an issue with a prior bus aide or driver.  His only prior incident was one day in second grade when he repeatedly attempted to stand up during a bus ride.

### Defendants Had Received Repeated Warnings of Bus Aides Assaulting or Threatening Children with Disabilities

29.     Durham Transportation provided bus services for Ann Arbor Public Schools at all relevant times.

8

30.     On its website, Durham Transportation claimed that its "Special Needs Staff" has "customized ongoing training based on students' needs" and "ongoing communication with district personnel."[1]

31.     Typically, the same bus aide assists the same bus route every day.

32.     When J.W. joined the EISCC program at Carpenter Elementary, the assigned bus aide on Bus 17 was Rochanda Jefferson ("Jefferson").

33.     Prior to J.W.'s time on Bus 17, AAPS and Durham had notice of prior incidents of bus staff assaulting children with disabilities, caused in part by inadequate or nonexistent training for how to assist children with behavioral challenges.

34.     For example, on October 18, 2016, an AAPS/Durham bus aide hit a disabled child in the stomach after the child swatted at him. Multiple staff witnessed the incident and intervened. A police report was filed.

35.     Before J.W. joined Bus 17, AAPS and Durham had received prior complaints that Jefferson behaved in a way that was threatening and aggressive.

**Jefferson Immediately Begins Targeting J.W.**

36.     Problems began immediately on J.W.'s first day riding Bus 17.

---

[1] https://www.durhamschoolservices.com/special-needs/

37.    On December 6, 2021, when the bus dropped J.W. off at his house. Jefferson got off the bus to speak to Nelson. Jefferson was upset.

38.    Jefferson said to Nelson, "He [J.W.] swung out at me and I can't hit him, so I don't know what you want me to do."

39.    Nelson was shocked by this comment. Nelson was surprised and concerned that an aide on a bus designated for children in special education programs would react this way to an emotionally impaired child's ordinary behavioral challenges.

40.    Nelson asked Jefferson if anyone had talked to her about J.W.'s special education needs. Jefferson said no.

41.    Jefferson complained to Nelson about J.W. for several minutes while other children sat on the bus, waiting to go home.

42.    Nelson was concerned that the bus aide exhibited little to no training to work with children with behavioral challenges that were ordinary for children in the special education programs, despite working on a bus dedicated to children with disabilities, including AAPS children enrolled in the highest level of special education support.

43.    The next day, on December 7, 2021, Nelson called J.W.'s classroom teacher, Sara Operacz, an educator who is certified to work with emotionally impaired students. J.W. was one of five students in her class.

44.     Nelson informed Operacz of her concerns about Jefferson and asked if the school could communicate with the bus providers.

45.     Operacz said she was very sorry it had happened and that she would look into it.

46.     Operacz offered to walk J.W. out to the bus and introduce him to the bus aide with some information about his special needs.

47.     Shortly afterwards, Operacz told Nelson that she was observing escalated behavioral issues for J.W. at the end of the day when he anticipated having to ride the bus.

48.     Operacz told Nelson that she spoke with the Principal of Carpenter Elementary, Michael Johnson, about the bus concerns.

49.     On Monday, December 13, 2021, Nelson texted Principal Johnson. Nelson had previously met Johnson during his time as principal at Lakewood, where Nelson's other son attended school.  Nelson texted Johnson to ask his opinion about putting J.W. on the bus.

50.     Johnson responded that Nelson should put J.W. on the bus. A few minutes later, Johnson texted Nelson not to tell any teachers.

## The First Known Assault

51.     On Tuesday, December 14, 2021, at approximately 4:30 pm, Nelson received a phone call from the AAPS Transportation Department Main Dispatch.

The dispatcher said that J.W. was having behavioral issues on the bus and that Nelson may need to pick him up.

52.     Video from Bus 17 on December 14, 2021 shows that during this ride home, J.W. moved between different seats and crawled onto the floor while the bus was in motion. He swiped his arm at Jefferson—a common behavior for an agitated child with his disability.

53.     On the video, Jefferson audibly responded: "I'm gonna hit you back. . . . I whoop kids."

54.     J.W. ran for safety to the back of the bus. He sat calmly for several minutes. Jefferson nonetheless proceeded to attempt to restrain J.W. with a star harness.

55.     Using the star harness for J.W. violated his individualized education plan (IEP) with the school district.

56.     Under Michigan law, the "star harness" is restricted for emergency use where a student's behavior poses an imminent risk to their own safety or the safety of others. MCL 380.1307 et seq.

57.     While the bus was stopped, the bus driver attempted to help carry J.W. from a seat in the back and to his original seat at the front, where Jefferson had set up the harness.

58.     Jefferson roughly took J.W. from the bus driver. Jefferson carried J.W. by his arms to the front of the bus. J.W. began to scream and tried to get away. Jefferson threw J.W. into a STAR harness in the front row.

59.     J.W. continued to scream for help and flailed his arms. Jefferson attempted to force J.W. into the STAR harness. She did not know how to operate the harness and only partially restrained him.

60.     Jefferson demonstrated no training for de-escalation with a child with behavioral or emotional impairments, even though these methods are standard in special education programs.

61.     Instead, Jefferson used physical violence.

62.     The video shows that with J.W. restrained in the harness, as he continued to scream, Jefferson hit him forcefully and repeatedly, each time raising her right arm into the air before striking him. He screamed over and over as she hit him.

63.     At approximately 5:00 pm, the bus arrived at Nelson's house. Nelson was standing outside to meet the bus. At that time, she had no idea that her child had just been assaulted on his ride home from school.

64.     J.W. ran off the bus, past Nelson, into the house, and locked his mother out. J.W. hid behind the front door sobbing.

65.     Jefferson got off the bus and yelled at Nelson about J.W. She was irate that one of her nails had broken off in their interaction.

66.     When Nelson went back to the house, J.W. had locked her out and was extremely upset. When Nelson tried to talk to J.W. about what happened on the bus, he became extremely physically agitated and refused to speak about it.

### Children Report the First Assault, While Defendants Cover It Up

67.     The next day, on December 15, 2021, multiple Carpenter students told AAPS staff that they saw Jefferson hit J.W. on the bus. Children reported the incident to at least one teacher and one social worker.

68.     A social worker interviewed multiple children and documented their reports.

69.     On or about December 15, 2021, the social worker and/or other AAPS staff gave Principal Johnson written reports about the assault and the interviews with children who witnessed it.

70.     Jefferson, Durham, Johnson, and AAPS all failed to document that J.W. was restrained in a star harness.

71.     Jefferson, Durham, Johnson, and AAPS all failed to report the first assault to Child Protective Services.

14

72.    Just one CPS report was filed for the incident, by an unknown party, on or about December 15th.

73.    No one at Ann Arbor Public Schools notified Nelson that multiple children had separately reported her son had been physically assaulted on the bus.

### Defendants Knowingly Place J.W. and Jefferson Together on the Bus for Weeks, Where Abuse Continues

74.    By December 15, 2021, Defendants had notice that Jefferson had assaulted J.W., that there had been prior complaints about Jefferson, and that another bus aide had previously assaulted a child with a disability several years earlier.

75.    These events established a pattern of similar abuse by untrained personnel: bus aides did not understand how to work with children with behavioral challenges, and responded to agitated disabled children by hitting them.

76.    From December 15, 2021 until January 18, 2022, AAPS and Durham staff and administrators put J.W. on the bus with Jefferson despite knowledge that multiple students had reported Jefferson had physically assaulted him.

77.    Defendants ignored and concealed reports of the abuse from other children on the bus based on stereotypes that children with disabilities are "bad" kids who are unreliable, poorly behaved, and that they deserve harsher discipline.

78.     At 4:42 pm on December 15, 2021, AAPS Transportation Dispatch called Nelson again. They advised that J.W. was having trouble again and that Nelson may have to pick him up.

79.     At 4:55 pm, Jefferson called Nelson from her personal cell phone and told Nelson that she needed to pick J.W. up from the bus on North Bay Drive, about a ten-minute drive from the house.

80.     Nelson left immediately to pick up her son. When she arrived, the bus was stopped on the side of the road. J.W. was inside the bus, banging on the doors to get out. His shirt was disheveled, and he was missing his shoes. He was covered in sweat and shaking. Nelson had never seen her son experience such an intense physiological reaction.

81.     The bus driver collected J.W.'s backpack, shoes, and jacket, which were strewn around the bus. Jefferson stayed in the back of bus and did not speak to Nelson.

82.     Nelson pulled J.W. off the bus. J.W. ran away from the bus and ran across the street, hysterically crying. He had no shoes or coat on in December.

83.     Nelson went to help her son. Eventually, she helped him into her car. On the drive home, J.W. was so distressed that he tried to get out of the car several times while it was moving.

84.     That night, Nelson texted with Operacz to inform her about the incident.

85.     Durham never reported to AAPS that J.W. was picked up on the side of the road by his mother, ten minutes away from his assigned destination.

86.     On December 16, 2021, Operacz contacted Principal Johnson about the assault reported by the students. She expressed her sincere concerns that the bus aide was allowed to continue on the bus with J.W. and other children with disabilities who could also be targeted.

87.     Sometime the same week, Principal Johnson emailed Durham Transportation about allegations of a student being assaulted.

88.     Johnson did not contact Nelson about the assault in December. Johnson did not inform Nelson about his notice of the incident until over a month later on January 19, 2022, detailed below.

89.     From December 15, 2021 until January 18, 2022, AAPS, Johnson, and Durham continued to place J.W. on the afternoon bus with Jefferson.

90.     During this period, J.W. often exhibited distress and fear in the afternoon as he anticipated riding the bus with Jefferson.

91.     During this period, he had no behavioral difficulties or other incidents on his mid-day bus, which was staffed by a different bus aide.

92.     During this period, Jefferson continued to verbally harass and taunt J.W. For example, Jefferson repeatedly threatened J.W. that he was going to get in trouble at home and tell him that his mom was angry at him. On other occasions,

17

Jefferson told J.W., "You're going to jail," and "I really want to break your behind right now."

93. As a seven-year-old child with autism and an emotional impairment, Jefferson's harassment caused J.W. extreme distress and fear.

94. On multiple occasions, when Jefferson's ongoing verbal harassment caused J.W. to become distressed, she physically restrained him in a STAR harness in violation of his IEP.

95. Jefferson's conduct suggested that she had no training and no familiarity with special education laws or procedures, including the role of an IEP.

96. Jefferson targeted J.W. for harassment and abuse because of his disability. Her abusive statements and conduct demonstrated an intense sense of animus towards J.W. specifically because of the behaviors caused by his disability.

97. Jefferson also harassed Nelson. While all communications between bus staff and parents were supposed to be directed through dispatch, Jefferson frequently called Nelson from her cell phone to make bizarre and hostile comments. Jefferson also frequently got off the bus at Nelson's house to complain about J.W. Jefferson's comments to Nelson included and were not limited to:

> a. Telling Nelson that the "teacher at [J.W.'s] school doesn't even care about him."

    b.  Threatening to take videos of J.W. on her personal

       cell phone.

    c.  Telling Nelson that J.W. cannot ride the bus, despite

       having no authority to make that claim.

98.    On January 10, 2022, Nelson emailed Operacz again for help. Operacz responded she was attempting to speak with administrators about the situation.

99.    On January 14, 2022, Operacz contacted Principal Johnson again about her concerns about the bus aide and the danger to J.W.

100.   On January 18, 2022, Operacz contacted Principal Johnson yet again about her concerns about the bus aide and the danger to J.W.

101.   On January 18, 2022, Operacz emailed Nelson: "I wanted to let you know that I met with my assistant director today and she just got off the phone with transportation and the director of special education to solve this bus issue. I also spoke with the bus driver today and told him that any phone calls to you need to come from dispatch. I also told him that if there is an emergency then there needs to be an incident report. We did not receive an incident report from last Friday. I also reached out to Mr. Johnson today to see if he has time this week to sit down with me for a meeting so we can discuss solutions from the building level to help with this situation."

102.   At this point, Nelson still had not been informed of the reports that Jefferson had assaulted her son.

103.   The same day, on January 18, 2021, Operacz emailed Principal Johnson, Terra Webster (AAPS 504 Coordinator and Carpenter Elementary School Administrator), and Derek Gramza (the ASD Classroom Special Education Teacher). She wrote:

> I have forwarded an email from J[.W.]'s mom sharing the concerns she has about the bus situation and bus aide. I am very concerned about this situation and the safety of our students. . . . I haven't received an update on the allegations that were shared. **I am concerned that I am going to lose all credibility with mom when she finds out that I knew about these allegations and didn't tell her.** I also don't feel comfortable keeping this from mom. (Emphasis added).

104.   Operacz also described how she had received no update on how the assault allegations since she had contacted Johnson for information on December 16th and January 14th. She also noted that only one incident report had been filed: "If there has only been one incident report written it is concerning that the bus aide continues to call mom daily." Operacz requested a meeting within the week.

105.   Shortly after, Nelson asked her son if Jefferson had hit him more than once. J.W. said "yeah, but it didn't hurt that bad."

106.   Based on J.W.'s statements to his mother and Principal Johnson's email, at some time between December 15, 2022 and January 19, 2022, Jefferson assaulted J.W. a second time, and plausibly on multiple further occasions.

**AAPS and Johnson Admit "Two Incidents"**
**But Refuse to Provide Information and Continue to Delay Full Investigation**

107.   On January 19, 2022, at 10:25 am, Nelson received an email from Principal Johnson, copying Audra Holdorf, Cheryl Brown, Terra Webster, and Derek Gramza. In his email, Johnson acknowledged at least "two incidents" on the bus that "resulted in unsafe conditions" for J.W.

108.   In the same email, Johnson indicated that that he had reached out to Durham Bus Transportation Services with a request to investigate prior to Winter Break.

109.   Defendants decided to continue staffing Jefferson on the bus and affirmatively chose not to retrain, reassign, discipline, or report Jefferson to law enforcement pending this alleged investigation.

110.   At 10:56 am the same day, January 19, 2022, Audra Holdorf (Assistant Director of Student Intervention and Support Services) responded by email to Principal Johnson, Nelson, Cheryl Brown, and others: "Thank you Carpenter team for working with the family and the staff to resolve this safety concern from the bus . . . Durham  has retrieved the video and we are reviewing it to investigate."

111.   This was the first time Nelson learned that there might be video of a specific incident.

112.   By phone the same day, Brown told Nelson that Jefferson would be removed from Bus 17 starting the following Monday. Brown asked Nelson if she could pick J.W. up from school during the next three days while Jefferson was still the designated aide on Bus 17.   Brown told Nelson that Jefferson would be reassigned to another bus route with AAPS.

113.   AAPS, Johnson, and Durham indicated no concern that transferring Jefferson to another bus would place other children in danger.

114.   Brown told Nelson that Transportation was reviewing the video.

115.   After the call, at 1:42 pm, Nelson emailed Brown and copied Operacz: "Thank you for speaking with me today and helping to expedite the unacceptable situation on Bus 17."  Nelson included a list of notes about her concerns:

   a.   Call on my personal cell phone from the aide's personal cell phone on a regular basis.

   b.   Threatens that [J.W.] cannot ride the bus, but not her authority.

   c.   First day: comes off the bus and says [J.W.] 'struck out at her'. and she can't hit kids so not sure what's going to happen. I said that is why he attends a special classroom and a common behavior on his part.

   d.   Aide told me that the "teacher at his school doesn't even care about him."

   e.   Threatens to take videos on her cell phone and send them to me.

     f.    Continually threatens [J.W.] that he will get in trouble at home after I have spoken to her multiple times that this is ineffective.

     g.    Aide gets off bus on regular basis to come tell me how awful [J.W.] is, sometimes for up to 10 minutes with other kids waiting on bus.

     h.    [J.W.] outwardly says she [Jefferson] hates him.

     i.    [J.W.] has no problems with bus ride mid-day [with a different aide].

     j.    Bus driver is very kind about [J.W.] and says he has had much worse. He tells me how much he likes [J.W.].

116.   Later the same day, on January 19, 2022 at 3:36pm, Brown responded by email to Nelson, Principal Johnson, Audra Holdorf, Terra Webster, and Derek Gramza: "Upon getting some information regarding the incidents and interaction of the monitor [bus aide], I have asked that the monitor be removed from the route and I will review the video within the next few days to see what support might be needed to ensure that all the students on the bus are safe."

117.   Nelson responded by email and asked to see the video from the bus route.

118.   Nelson received no further emails from AAPS that day.

119.   The same day, Nelson called Brown again. Nelson stated that she needed to see the video and that the situation was far more severe than she was previously informed. Nelson told Brown that she was texting with Fidishin, the

Superintendent of Special Services for AAPS. Fidishin told Nelson that they would watch the video first thing in the morning and that AAPS would contact Nelson.

120.   Later in the day on January 19th, Nelson spoke by phone with Operacz for nearly an hour.

121.   Operacz revealed to Nelson that some kind of assault had occurred on the bus, as reported by multiple students to school officials.

122.   On January 20, 2022, Nelson sent an email to AAPS reiterating her request to see the video.

123.   On January 20, 2022, Nelson texted Operacz to ask for more information and any updates. Operacz responded that she was in a terrible position and could not say anything more. Operacz did tell Nelson that Jefferson had been removed from all of the buses.

124.   The same day, at 12:34 pm, Nelson emailed Brown, Holdorf, and Fidishin indicating that she had been made aware that the District knew a video existed demonstrating the reported abuse for weeks, yet the District still had not yet reviewed the video.

125.   Holdorf denied Nelson's request to view the video.

126.   At the end of the day on January 20, 2022, Holdorf emailed Nelson to inform her that she had watched the video for December 15th and the bus aide did not physically assault J.W.

127.    Holdorf reviewed the wrong video——the assault was on December 14th.

128.    Defendants did not review video for any other dates even though Principal Johnson stated in an email on January 19, 2022 that there were two separate incidents.

129.    Johnson, AAPS, and Durham concealed all information about this second incident.

130.    On Monday, January 24, 2022, Nelson called Operacz. Operacz explained she had been advised not to talk to Nelson directly about the issue anymore.

## J.W. Finally Allowed to Ride With Another Bus Aide

131.    On January 24th, J.W. began riding with a new bus aide. That day, the bus driver for Bus 17 told Nelson he was sorry about Jefferson. He also confirmed he had witnessed her being "rough" with J.W.

132.    J.W. had a quiet and uneventful ride home with the new bus aide.

133.    J.W. was not the only child with a disability who had significant problems in the EISCC program at Carpenter Elementary School.

134.   At some time in January 2022, Audra Holdorf (Assistant Superintendent of Special Education) told Nelson that the District was considering relocating the EISCC program to another host elementary school.

135.   By February 8, 2022, J.W. had ridden the bus with four different new aides, with no incidents. J.W.'s behavior at home and at school indicated that he was significantly less afraid to ride the bus.

## Abuse Has Lasting Impact

136.   On March 15, 2022, Pittsfield Township Police Detective Kyle Erskine called Nelson. He informed her that an incident regarding her son was reported to CPS and that assault charges would be referred to the Prosecutor's Office. Officer Erskine said he could not disclose to Nelson who reported the incident.

137.   On April 6, 2022, J.W. transferred to Progress Park, a public school that is dedicated to supporting children with emotional impairments in the Washtenaw Intermediate School District.

138.   On April 14, 2022, Nelson met Detective Erskine at the police station and finally saw the bus video for December 14, 2021. The video shows that on that date, Jefferson attempted to force J.W. into a star harness and then repeatedly struck him while his arms were restrained.

139. Neither Jefferson, Durham, or AAPS informed Nelson or completed documentation that the specialized restraint had been used, in violation of MCL 380.1307d.

140. Afterwards, Nelson asked J.W. about the harness. J.W. told Nelson that Jefferson had restrained him in a harness on the bus on two other occasions, for a total of three times. None of these were documented as required by law.

141. J.W. has never been placed in a STAR harness at any time before or after his time on Bus 17.

142. In 2022, AAPS removed the EISCC program from Carpenter Elementary.

143. The Washtenaw County Prosecutor's Office criminally charged Jefferson with child abuse.

144. On June 28, 2023, Jefferson was found guilty of child abuse in a bench trial. *People of the State of Michigan v. Jefferson*, Case No. 2022001989.

145. J.W. continues to benefit from the additional supports at Progress Park.

146. J.W.'s demeanor when he comes home from the bus is vastly improved from his time on Bus 17. Since he stopped riding the bus with Jefferson, he has never come home from the bus in the state of distress that he exhibited during his time on Bus 17.

147.   However, the abuse and assaults by Jefferson have caused J.W. severe emotional distress, including significant emotional dysregulation and behavioral regression at times. Since the incidents with Jefferson, J.W.'s caregivers and teachers have observed that J.W. has had especially strong reactions to physical touch by an adult. His ability to establish relationships with adults has been diminished. When caregivers need to provide physical restraint to assist J.W., he now suffers extreme reactions that can lead to him wetting himself, banging his head, removing his clothes, and screaming in distress.

148.   Nelson has also suffered severe emotional distress as a result of watching her son's suffering each day as Defendants concealed his abuse in December 2021 and January 2022; suffering verbal harassment herself when Jefferson called Nelson during bus rides; the horror and pain of witnessing an adult verbally and physically abuse her child when Nelson was finally able to watch the bus video; fighting to protect and support her child in the face of obstruction and concealment by Defendants; and the ongoing fear, anxiety, and distress as she has sought support and recovery for both her son and herself.

## COUNT I
### STATE CREATED DANGER — 42 U.S.C. § 1983
### J.W. v. Principal Johnson and Durham Transportation

149.   Plaintiffs incorporate the above allegations as though fully stated herein.

150. Section 1983 provides a statutory cause of action for the deprivation of federal rights, privileges, or immunities by those acting under color of state law. 42 U.S.C. § 1983.

151. Defendants, by their affirmative acts, created and exacerbated the risk that Jefferson would physically assault J.W., in violation of the Fourteenth Amendment to the United States Constitution, enforced pursuant to 42 U.S.C. § 1983.

152. Jefferson was acting under color of state law at all times in her interactions with J.W. and Nelson because supervising and assisting children on the bus were her official duties and all of her interactions with J.W. took place within the scope of her employment as a bus aide with Durham and AAPS.

153. At all relevant times, Jefferson and Defendant Johnson were acting under the color of state law as employees of Ann Arbor Public Schools, a public school district, including and not limited to supervising and directing transportation and educational services for J.W.; actions and decisions regarding school practices and procedures, both formal and informal; and in their conduct as public school administrators.

154. Durham was acting under color of state law at all relevant times by (a) providing a public service by operating school buses for a public school district, a function traditionally performed by public entities and (b) acting so closely with

AAPS that Durham's staffing, training, and supervisory actions were the actions of AAPS, and (c) having a symbiotic relationship with AAPS in which AAPS administrators played a role in Durham's operations and decision-making, including staffing, training, and supervisory functions.

155.   Both Durham and Johnson had the authority and ability to make staffing, training, and supervisory decisions with respect to Johnson, including and not limited to directing that Jefferson be removed, trained, or reassigned.

156.   Both Durham and Johnson had notice of a pattern of prior similar abuse by untrained personnel.

157.   Both Durham and Johnson had notice that bus aides on AAPS/Durham school buses did not understand how to work with children with behavioral challenges, and responded to agitated disabled children by hitting them.

158.   Before the first known incident of physical assault of J.W., Defendant Johnson, along with other AAPS staff and administrators, knew of the specific and excessive risk that Jefferson posed. Defendant Johnson knew from communications with classroom teachers and other AAPS staff that prior to the first assault, Jefferson had stated, "I can't hit him, so I don't know what you want me to do." Johnson also knew that J.W. was exhibiting escalated behavioral issues the hour before the end of the day when he anticipated interactions with Jefferson.

159.    Defendant Johnson took affirmative acts that created or increased the risk of danger that Jefferson would assault or continue to assault J.W., including and not limited to:

    a.    Principal Johnson instructed Nelson in a text message on December 13, 2021 to keep J.W. on the bus, directing Nelson not to pick up her son.

    b.    Johnson instructed Nelson not to pick up her son and misled her to believe that her son was safe.

    c.    A few minutes later, Johnson texted Nelson not to tell any teachers.

    d.    Johnson concealed information about Jefferson from Nelson, law enforcement, and others who could have intervened to keep J.W. safe.

    e.    Johnson continued to staff Jefferson on the bus even after notice that Jefferson was abusing J.W. and exhibited wholly inadequate training for her role, despite his authority and ability to direct that she be removed, trained, or reassigned—placing J.W. and all of the children on the bus in danger.

160.    Jefferson's physical assault of J.W.—in which she restrained a disabled seven-year-old and then struck him repeatedly as he cried for help—shocks the

conscience and violated J.W.'s clearly established rights under the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983.

161.   On or about December 15, 2021, Defendant Johnson knew from reports by an AAPS social worker and multiple children that Jefferson had physically assaulted J.W. on December 14, 2021.

162.   Despite knowledge of the December 14, 2021 assault, Defendant Johnson took further affirmative acts that created or increased the risk of danger that Jefferson would harass and assault J.W. on further occasions, including and not limited to:

    a.   Johnson knowingly assigned Jefferson to Bus 17 despite his authority and ability to direct that she be removed, trained, or transferred.

    b.   Johnson knowingly staffed a school bus dedicated to transporting children with special needs and disabilities with a dedicated bus aide who displayed no comprehension of how to interact with children with special needs and disabilities and a history of violent threats towards those children.

    c.   Johnson reported the assault to Durham and then acted in concert with Durham and other AAPS administrators to conceal the assault from Nelson and from law enforcement;

d. Johnson instructed Nelson not to pick up her son and misled her to believe that her son was safe.

e. Johnson promoted a policy, practice, or custom of concealment, misrepresentation, minimizing or avoidance and non-escalation of suspected or known risks of abuse of children in the special education program;

f. Johnson declined to file a mandatory report of suspected child abuse or neglect in violation of MCL § 722.623(a);

g. Johnson promoted a policy, practice, or custom of declining to file mandatory reports of suspected child abuse or neglect in violation of MCL § 722.623(a) and discouraged teachers, social workers, and other AAPS administrators from reporting suspected child abuse or neglect, despite their status as mandatory reporters;

h. Johnson promoted a policy, practice, or custom of inadequate or nonexistent training for staff working with children in the special education program at AAPS, and this policy was the result of Johnson's deliberate indifference to known prior reports of mistreatment and improper conduct by untrained employees with children in the special education program at AAPS; and

      i.   Any and all additional affirmative acts that created or increased the danger that Jefferson would assault J.W. that may become known throughout the course of this litigation.

163.   Similarly, Defendant Durham had notice of the December 14, 2021 assault from communications with AAPS staff on or about December 15, 2021.

164.   Despite knowledge of the December 14, 2021 assault, Defendant Durham took further affirmative acts that created or increased the risk of danger that Jefferson would harass and assault J.W. a second time, including and not limited to:

      a.   Durham knowingly assigned Jefferson to Bus 17 despite Durham's authority and ability to direct that Jefferson be removed, trained, or reassigned.

      b.   Durham knowingly staffed a school bus dedicated to transporting children with special needs and disabilities with a dedicated bus aide who displayed no comprehension of how to interact with children with special needs and disabilities and a history of violent threats towards those children.

      c.   Durham acted in concert with Johnson and other AAPS administrators to conceal the assault from Nelson and from law enforcement;

d.  Durham prevented Nelson from picking up her son and misled her to believe that her son was safe.

e.  Durham promoted a policy, practice, or custom of concealment, misrepresentation, minimizing or avoidance and non-escalation of suspected or known risks of abuse of children by bus staff;

f.  Durham promoted a policy, practice, or custom of inadequate or nonexistent training for staff working with children on the bus dedicated to serving children in the special education program at AAPS, and this policy was the result of Durham's deliberate indifference to known prior reports of mistreatment and improper conduct by untrained employees with children in the special education program on Durham buses; and

g.  Any and all additional affirmative acts that created or increased the danger that Jefferson would assault J.W. that may become known throughout the course of this litigation.

165.  Through these affirmative acts, Defendants Johnson and Durham, acting as Jefferson's supervisors and with full authority to make staffing, training, and other supervisory decisions, affirmatively endorsed, authorized, approved, and knowingly acquiesced in the clearly unconstitutional assaults perpetuated by Jefferson.

35

166.   The actions of Defendants Johnson and Durham created a special danger to the children riding Bus 17, especially J.W., who Defendants knew to be the target of Jefferson's harassment and assault.

167.   Defendants knew or clearly should have known that their actions specifically endangered the children riding Bus 17 with Jefferson, especially J.W.

168.   Based on their knowledge that Jefferson had physically assaulted J.W., a seven-year-old child diagnosed with autism and severe emotional impairment, Defendants Johnson and Durham were fully aware that staffing Jefferson on Bus 17 and obstructing any intervention or reports or law enforcement created a substantial risk of serious harm to the children riding the bus with Jefferson, especially J.W.

169.   Defendants Johnson and Durham had ample time to deliberate and make an unhurried judgment about whether to revise their hiring, staffing, and training practices when they learned of prior assaults of disabled children by AAPS/Durham staff. Defendants were not forced to make a split-second decision.

170.   Defendants Johnson and Durham had ample time to deliberate and make an unhurried judgment about whether to assign Jefferson to Bus 17, whether to refer the situation to law enforcement, and whether to conceal the reports that an autistic child had been assaulted. They were not forced to make a split-second decision.

171.   Defendants Johnson and Durham are not entitled to qualified immunity because J.W.'s right to not be physically assaulted by a school employee was clearly established at the time of Johnson and Durham's actions.

172.   The conduct of Defendants Johnson and Durham was objectively unreasonable and performed knowingly, deliberately, and with deliberate indifference to the safety of J.W. and the other children on Bus 17, causing children with disabilities who rode the bus to be less safe than they were before Defendants' affirmative actions.

173.   Defendants Johnson and Durham knew that their conduct, which exacerbated the risk and ultimately escalated Jefferson's violence and harassment, violated the clearly established rights of J.W.

174.   Defendant's conduct was so egregious and outrageous that they shock the contemporary conscience and demonstrate Defendants' deliberate indifference to J.W.'s physical safety.

175.   As a direct and proximate result of the Defendants' state-created danger in violation the Fourteenth Amendment, Jefferson physically assaulted Plaintiff J.W. on at least two occasions and verbally harassed and taunted J.W. for weeks until Nelson was finally able to discover the abuse. As a result of these constitutional violations, J.W. has suffered injuries including and not limited to those detailed above at ¶147.

## COUNT II
### State Created Danger — *Monell* Claim under 42 U.S.C. § 1983
### J.W. v. AAPS

176.   Plaintiffs incorporate the above allegations as though fully stated herein.

177.   Section 1983 provides a statutory cause of action for the deprivation of federal rights, privileges, or immunities by those acting under color of state law. 42 U.S.C. § 1983.

178.   Defendant Ann Arbor Public Schools and its administrators and policymakers, including Principal Johnson, acting in concert with Durham School Services, adopted and maintained official policies, practices, and customs that were the moving force behind, and cause-in-fact of, the physical assaults of J.W. by bus aide Rochanda Jefferson.

179.   These official policies, practices, and customs included and are not limited to:

    a.   Failing to train staff, including bus staff, on the specific behavioral and disciplinary requirements for children with special needs, autism, and emotional impairment, in order to equip staff to provide effective and appropriate communication and discipline methods for students with special needs;

b. A policy, practice, or custom of concealment, misrepresentation, minimizing, avoidance, and non-escalation of suspected or known risks of abuse of children in the special education program, including on the dedicated AAPS/Durham bus for children in the special education program;

c. A policy, practice, or custom of declining to file mandatory reports of suspected child abuse or neglect in violation of MCL § 722.623(a) and discouraging teachers, social workers, and other AAPS administrators from reporting suspected child abuse or neglect, despite their duties as mandatory reporters;

d. A policy, practice, or custom of inadequate or nonexistent training for staff working with children in the special education program at AAPS, and this policy was the result of Johnson's deliberate indifference to known prior reports of mistreatment and improper conduct by untrained employees with children in the special education program at Carpenter; and;

e. Any and all additional affirmative acts that created or increased the danger that Jefferson would assault J.W. that may become known throughout the course of this litigation.

180.   These official policies, practices, and customs were inadequate for the task of safely transporting children with disabilities, and that inadequacy was the result of AAPS's deliberate indifference.

181.   Both AAPS and Johnson had notice of a pattern of similar abuse by untrained employees dating back to at least 2016.

182.   These policies, practices, and customs caused or were closely related to Jefferson's repeated assaults of J.W., violating his constitutional rights.

183.   As a result of these unconstitutional policies, practices, and customs, J.W. has suffered injuries including and not limited to those detailed above at ¶147.


## COUNT III
### VIOLATION OF BODILY INTEGRITY — 42 U.S.C. § 1983
### J.W. v. Principal Johnson and Durham

184.   Plaintiffs incorporate the above allegations as though fully stated herein.

185.   Section 1983 provides a statutory cause of action for the deprivation of federal rights, privileges, or immunities by those acting under color of state law. 42 U.S.C. § 1983.

186.   Defendants violated J.W.'s substantive due process right to personal security and bodily integrity by their discretionary conduct, which was deliberately indifferent to and callously disregarded the known risk that J.W. would be assaulted

by Jefferson, resulting in the assault of a disabled child on a public school bus that shocks the conscience, in violation of the Fourteenth Amendment to the United States Constitution, as enforced pursuant to 42 U.S.C. § 1983.

187.   Jefferson was acting under color of state law at all times in her interactions with J.W. and Nelson because supervising and assisting children on the bus were her official duties and all of her interactions with J.W. took place within the scope of her employment as a bus aide with Durham and AAPS.

188.   At all relevant times, Jefferson and Defendant Johnson were acting under the color of state law as employees of Ann Arbor Public Schools, a public school district, including and not limited to supervising and directing transportation and educational services for J.W.; actions and decisions regarding school practices and procedures, both formal and informal; and in their conduct as public school administrators.

189.   Durham was acting under color of state law at all relevant times by (a) providing a public service by operating school buses for a public school district, a function traditionally performed by public entities and (b) acting so closely with AAPS that Durham's staffing, training, and supervisory actions were the actions of AAPS, and (c) having a symbiotic relationship with AAPS in which AAPS administrators played a role in Durham's operations and decision-making, including staffing, training, and supervisory functions.

190.    Both Durham and Johnson had the authority and ability to make staffing, training, and supervisory decisions with respect to Johnson, including and not limited to directing that Jefferson be removed, trained, or reassigned.

191.    Defendants had notice of a pattern of similar abuse by untrained personnel, as detailed herein.

192.    Both Durham and Johnson had notice that bus aides on AAPS/Durham school buses did not understand how to work with children with behavioral challenges, and responded to agitated disabled children by hitting them.

193.    Defendants were deliberately indifferent to these known risks.

194.    Before the first known incident of physical assault of J.W., Defendant Johnson, along with other AAPS staff and administrators, knew of the specific and excessive risk that Jefferson posed. Defendant Johnson knew from communications with classroom teachers and other AAPS staff that prior to the first assault, Jefferson had stated, "I can't hit him, so I don't know what you want me to do." Johnson also knew that J.W. was exhibiting escalated behavioral issues the hour before the end of the day when he anticipated interactions with Jefferson.

195.    Jefferson's physical assault of J.W.—in which she restrained a disabled seven-year-old and then struck him repeatedly as he cried for help—shocks the conscience and violated J.W.'s clearly established right to bodily integrity and

freedom from bodily injury without due process of law under the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983.

196. Defendants Johnson and Durham had ample time to deliberate and make an unhurried judgment about whether to revise their hiring, staffing, and training practices when they learned of prior assaults of disabled children by AAPS/Durham staff. Defendants were not forced to make a split-second decision.

197. Defendants Johnson and Durham also had ample time to deliberate and make an unhurried judgment about whether to assign Jefferson to Bus 17, whether to refer the situation to law enforcement, and whether to conceal the reports that an autistic child had been assaulted. They were not forced to make a split-second decision.

198. Children attending AAPS and riding AAPS/Durham school buses are in an involuntary relationship with AAPS and Durham.

199. Choosing to place children with disabilities in danger by assigning untrained personnel as bus aides serves no legitimate governmental purpose.

200. Declining to report or obstructing mandatory reports to law enforcement serves no legitimate governmental purpose.

201. Defendants knew or clearly should have known that their actions created a substantial risk of serious harm to children in the special education program who rode the school bus, including J.W., and they accepted that risk.

202.   Defendants' conduct was so egregious and outrageous that they shock the contemporary conscience and demonstrate Defendants' deliberate indifference to J.W.'s physical safety.

203.   Defendants Johnson and Durham are not entitled to qualified immunity because J.W.'s right to not be physically assaulted by a school employee was clearly established at the time of their actions.

204.   As a direct and proximate result of the Defendants' state-created danger in violation the Fourteenth Amendment, Jefferson physically assaulted Plaintiff J.W. on at least two occasions and verbally harassed and taunted J.W. for weeks until Nelson was finally able to discover the abuse. As a result of these constitutional violations, J.W. has suffered injuries including and not limited to those detailed above at ¶147.

## COUNT IV
## DISCRIMINATION IN VIOLATION OF
## THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12132 et seq.

### J.W. v. AAPS and Durham

205.   Plaintiffs incorporate the above allegations as though fully stated herein.

206.   Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be

excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

207.   AAPS is a covered public entity under the ADA as an instrumentality of a local government. 42 U.S.C. § 12131(1)(B).

208.   As an operator of public school buses, Durham is a covered public entity for purposes of the ADA. 42 U.S.C. § 12141(5).

209.   As a child who has been diagnosed with autism and emotional impairment, impairments that substantially limits one or more major life activities, Plaintiff J.W. has a disability.  42 U.S.C. § 12131(2).

210.   J.W. was qualified for and invited by AAPS to join the Emotionally Impaired Self-Contained Classroom (EISCC) at Carpenter Elementary School, which included riding a school bus dedicated to providing transportation for children participating in special education programs at AAPS. At no time before or after his time on Bus 17 has J.W. ever had a difficult relationship or ongoing behavioral problems riding the school bus.

211.   Plaintiff J.W. was denied the benefits of and subjected to discrimination in EISCC at Carpenter Elementary School and in his bus ride home from school each day because when J.W. rode home from school on an AAPS/Durham school bus, he was subjected to repeated physical assaults and verbal harassment by a bus aide.

212. AAPS and Durham forced Plaintiff J.W. to leave the EISCC program at Carpenter as a result of the assaults, exclusion, and indifference that he endured. Instead of accessing the specialized program at EISCC in his home school district, J.W. had to transfer to another school district for comparable services.

213. Jefferson, the bus aide, targeted J.W. for physical abuse and verbal harassment because of his disability. Jefferson determined that J.W. deserved corporal punishment and verbal harassment because of her animus and complete misunderstanding of behaviors caused by J.W.'s disability, namely his impaired ability to communicate with her.

214. Through their affirmative actions detailed above at Paragraphs 121-122, Defendants were Jefferson's supervisors and had joint authority to make staffing, training, and other supervisory decisions, affirmatively endorsed, authorized, approved, and knowingly acquiesced in the clearly unconstitutional assaults perpetuated by Jefferson.

215. By endorsing Jefferson's conduct, maintaining policies of concealment, and maintaining policies of staffing unvetted and inadequately trained personnel, AAPS and Durham demonstrated their animus towards children with disabilities in the special education program and their deliberate indifference to abuse of those children.

216.   As a direct and proximate result of Defendants' discrimination in violation of the ADA, J.W. has been forced to transfer schools and suffered injuries including and not limited to those detailed above at ¶147.

## COUNT V
## DISCRIMINATION IN VIOLATION OF
## SECTION 504 OF THE REHABILITATION ACT

### J.W. v. AAPS and Durham

217.   Section 504 of the Rehabilitation Act of 1973, as amended, provides that "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

218.   AAPS is a covered entity under Section 504 because the school district receives federal financial assistance.

219.   "Under Section 504, a school district is required to offer transportation services in such a manner as is necessary to afford students with disabilities an equal opportunity for participation in such services and activities." Whitman-Hanson (Ma) Regional Sch. Dist., 20 IDELR 775, 779 (OCR 1993).

220.   As an operator of public school buses, Durham is a covered public entity for purposes of the Section 504.

47

221.   As a child who has been diagnosed with autism and emotional impairment, impairments that substantially limits one or more major life activities, Plaintiff J.W. has a disability under Section 504.

222.   J.W. was qualified for and invited by AAPS to join the Emotionally Impaired Self-Contained Classroom (EISCC) at Carpenter Elementary School, which included riding a school bus dedicated to providing transportation for children participating in special education programs at AAPS. At no time before or after his time on Bus 17 has J.W. ever had a difficult relationship or ongoing behavioral problems riding the school bus.

223.   Plaintiff J.W. was denied the benefits of and subjected to discrimination in EISCC at Carpenter Elementary School and in his bus ride home from school each day because when J.W. rode home from school on an AAPS/Durham school bus, he was subjected to repeated physical assaults and verbal harassment by a bus aide.

224.   AAPS, Principal Johnson, and Durham forced Plaintiff J.W. to leave the EISCC program at Carpenter as a result of the assaults, exclusion, and indifference that he endured. Instead of accessing the specialized program at EISCC in his home school district, J.W. had to transfer to another school district for comparable services.

225.   Jefferson, the bus aide, targeted J.W. for physical abuse and verbal harassment solely because of his disability. Jefferson determined that J.W. deserved

48

corporal punishment and verbal harassment because of her animus and complete misunderstanding of behaviors caused by J.W.'s disability, namely his impaired ability to communicate with her.

226. Through their affirmative actions detailed above, Defendant Principal Johnson and Defendant Durham, acting as Jefferson's supervisors and with joint authority to make staffing, training, and other supervisory decisions, affirmatively endorsed, authorized, approved, and knowingly acquiesced in the clearly unconstitutional assaults perpetuated by Jefferson.

227. By endorsing Jefferson's conduct, maintaining policies of concealment, and maintaining policies of staffing unvetted and inadequately trained personnel, Johnson, AAPS, and Durham demonstrated their animus towards children with disabilities in the special education program and their deliberate indifference to abuse of those children.

228. Johnson, AAPS, and Durham thereby excluded J.W. from participating in, denied J.W. benefits, and subjected him to discrimination solely because of his disability.

229. As a direct and proximate result of Defendants' discrimination in violation of Section 504 of the Rehabilitation Act, J.W. has been forced to transfer schools and suffered injuries including and not limited to those detailed above at ¶147.

**COUNT VI**
**DISCRIMINATION IN VIOLATION OF**
**Michigan Persons with Disabilities Civil Rights Act ("PWDCRA")**
**MCL 37.1101, et seq.**

### J.W. v. AAPS and Durham

230.   Plaintiffs incorporates the above allegations as though fully stated herein.

231.   The Michigan Persons with Disabilities Civil Rights Act ("PWDCRA") prohibits discrimination in public accommodations, public services, and educational facilities on the basis of disability. MCL § 37.1102(1).

232.   AAPS is an educational institution under the PWDCRA because it is a school district. MCL § 37.1401.

233.   Durham provides a place of public accommodation under the PWDCRA because Durham operates a business and transportation services for the public. MCL § 37.1301(a). Durham also operated as an agent of AAPS, an educational institution, for purposes of the PWDCRA. MCL § 37.1401.

234.   As a child who has been diagnosed with autism and emotional impairment, J.W. is a person with a disability as defined in the PDWCRA because he has one or more disabilities that substantially limit a major life activity. MCL § 37.1103(h).

235. J.W. was otherwise qualified for and invited by AAPS to join the Emotionally Impaired Self-Contained Classroom (EISCC) at Carpenter Elementary School, which included riding a school bus dedicated to providing transportation for children participating in special education programs at AAPS. At no time before or after his time on Bus 17 has J.W. ever had a difficult relationship or ongoing behavioral problems riding the school bus.

236. J.W.'s disabilities did not prevent him from utilizing and benefitting from public accommodations, public services, educational opportunities, and transportation services provided by AAPS and Durham.

237. In spite of J.W.'s qualifications, AAPS, Johnson, and Duram denied J.W. equal opportunity to secure similar education as other persons. Plaintiff J.W. was denied the benefits of and subjected to discrimination in EISCC at Carpenter Elementary School and in his bus ride home from school each day because when J.W. rode home from school on an AAPS/Durham school bus, he was subjected to repeated physical assaults and verbal harassment by a bus aide.

238. AAPS, Principal Johnson, and Durham forced Plaintiff J.W. to leave the EISCC program at Carpenter as a result of the assaults, exclusion, and indifference that he endured. Instead of accessing the specialized program at EISCC in his home school district, J.W. had to transfer to another school district for comparable services.

239.   Jefferson, the bus aide, targeted J.W. for physical abuse and verbal harassment because of his disability. Jefferson determined that J.W. deserved corporal punishment and verbal harassment because of her animus and complete misunderstanding of behaviors caused by J.W.'s disability, namely his impaired ability to communicate with her.

240.   Through their affirmative actions detailed above, Defendant Principal Johnson and Defendant Durham, acting as Jefferson's supervisors and with joint authority to make staffing, training, and other supervisory decisions, affirmatively endorsed, authorized, approved, and knowingly acquiesced in the clearly unconstitutional assaults perpetuated by Jefferson.

241.   By endorsing Jefferson's conduct, maintaining policies of concealment, and maintaining policies of staffing unvetted and inadequately trained personnel, Johnson, AAPS, and Durham demonstrated their animus towards children with disabilities in the special education program and their deliberate indifference to abuse of those children.

242.   As a direct and proximate result of Defendants' discrimination in violation of the PDCRA, J.W. has been forced to transfer schools and suffered injuries including and not limited to those detailed above at ¶147.

## COUNT VII
## FAILURE TO REPORT CHILD ABUSE
## Michigan Child Protection Law, MCL 722.623

### J.W. v. All Defendants

243.   Plaintiffs incorporate the above allegations as if fully stated herein.

244.   MCL 722.623 required each Defendant to report the child abuse by Jefferson because each Defendant had reason to believe that J.W. was being subjected to serious physical or mental harm by Jefferson.

245.   Under MCL 722.633(1), any person who is required to report actual or suspected child abuse but fails to do so without legal reason can be held civilly liable for harm caused by the failure to report the abuse.

246.   Each Defendant had notice that Jefferson was subjecting J.W. to serious physical or mental harm on or about December 15, 2021.

247.   As a result of each Defendants' failure to report that known abuse, Jefferson continued to verbally and physically abuse J.W. for weeks.

248.   As direct and proximate result of the child abuse that Defendants failed to report, J.W. was subjected to continued and ongoing physical, emotional, and verbal abuse, which constituted "serious physical harm" and "serious mental harm" as defined in MCL 722.633(1).

249.    Additionally, as a result of Defendants' failure to report the known child abuse, J.W. has suffered at least one additional assault and injuries including and not limited to those detailed above at ¶147.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Nelson and J.W. v. All Defendants

250.    Plaintiffs incorporate the above allegations as if fully stated herein.

251.    Defendants engaged in extreme and outrageous conduct through the following actions, including and not limited to:

    a.  Ignoring warnings and then notice that Jefferson was verbally abusing and threatening J.W.;

    b.  Instructing Nelson to continue placing her son on the bus even after warnings and/or notice that Jefferson was abusing J.W. and misleading Nelson to believe her son was safe;

    c.  Choosing, after notice of Jefferson's first assault, to staff Jefferson on the bus and affirmatively choosing not to retrain, reassign, discipline, or report Jefferson to law enforcement;

    d.  Knowingly staffing a school bus dedicated to transporting children with special needs and disabilities with a dedicated bus aide who displayed

no comprehension of how to interact with children with special needs and disabilities and a history of violent threats towards those children.

e.  Acting in concert with other Defendants to conceal the assault from Nelson, law enforcement, and other authorities;

f.  Demonstrating deliberate indifference to abuse of a child with disabilities in the special education program;

g.  Empowering Jefferson to continue engaging in child abuse by taking no action whatsoever to stop the abuse;

252.  Defendants acted intentionally when they committed these outrageous acts.

253.  Defendants intentionally caused Nelson, the mother of J.W., severe emotional distress by enabling criminal child abuse of her son, knowing that these crimes were being videotaped while they were occurring, and Plaintiffs were likely to personally observe crimes being committed against their son.

254.  As direct and proximate result of Defendants' intentional infliction of emotional distress, Nelson experienced significant mental anguish and distress, J.W. was physically and verbally abused, denied the benefits of the program he was enrolled in, experienced pain and suffering, emotional distress, and experienced significant emotional and behavioral regression.

255.   As a result, J.W. and Nelson have suffered injuries including and not limited to those detailed above at ¶¶147–148.

## RELIEF REQUESTED

256.   Accordingly, Plaintiffs respectfully request this Honorable Court grant the following relief in accordance with 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Michigan Persons with Disabilities Civil Rights Act, MCL § 37.1101, et seq.; the Michigan Child Protection Law, MCL § 722.623 et seq.; and all other applicable federal and state laws:

257.   As a direct and proximate result of the wrongful actions of Ann Arbor Public Schools, Principal Johnson, Durham Transportation, and their agents, Plaintiffs have suffered injuries as detailed herein and are entitled to:

    a.   Compensatory damages, including and not limited to medical care, mental healthcare, and costs associated with transferring schools.

    b.   Damages for physical and emotional distress, pain, suffering, inconvenience, mental anguish, anxiety, and loss of enjoyment of life;

    c.   Exemplary damages;

    d.   Punitive damages in light of Defendants' malice and reckless and callous indifference to the federally protected rights of others;

e.   Attorney fees and costs;

f.   Any and all other additional damages or remedies to be ascertained; and

g.   An Order of the Court for such other relief as the Court deems just and equitable.

Respectfully submitted,

PITT MCGEHEE PALMER BONANNI & RIVERS

By:   */s/ Megan Bonanni*

Megan Bonanni (P52079)
Danielle Y. Canepa (P82237)
Beth Rivers (P33614)
PITT MCGEHEE PALMER BONANNI & RIVERS
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mbonanni@pittlawpc.com
dcanepa@pittlawpc.com
brivers@pittlawpc.com
*Attorneys for Plaintiff*

Dated:  July 26, 2023

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAIME NELSON-MOLNAR,
individually and as next friend of
J.W., a minor,

       Plaintiff,

v.

ANN ARBOR PUBLIC SCHOOLS,
MICHAEL JOHNSON in his official
capacity as Principal of Carpenter
Elementary School, and DURHAM
SCHOOL SERVICES, d/b/a/
DURHAM TRANSPORTATION,

Defendants.

Case No.

Hon.

---

Megan Bonanni (P52079)
Danielle Y. Canepa (P82237)
Beth Rivers (P33614)
PITT MCGEHEE PALMER BONANNI & RIVERS
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mbonanni@pittlawpc.com
dcanepa@pittlawpc.com
brivers@pittlawpc.com
*Attorneys for Plaintiff*

---

**DEMAND FOR JURY TRIAL**

    Plaintiffs Nelson and J.W, through their attorneys, demand a trial by jury on

all issues within this cause of action.

                Respectfully submitted,

PITT MCGEHEE PALMER BONANNI & RIVERS

By:    */s/ Megan Bonanni*

Megan Bonanni (P52079)
Danielle Y. Canepa (P82237)
Beth Rivers (P33614)
PITT MCGEHEE PALMER BONANNI & RIVERS
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mbonanni@pittlawpc.com
dcanepa@pittlawpc.com
brivers@pittlawpc.com
*Attorneys for Plaintiff*

Dated:  July 26, 2023