UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAIME NELSON-MOLNAR
individually and as next friend
of J.W., a minor,

                Plaintiffs,          Case No. 23-CV-11810
                                     HON. GEORGE CARAM STEEH

vs.

ANN ARBOR PUBLIC SCHOOLS,
MICHAEL JOHNSON, in his official
capacity as Principal of Carpenter
Elementary School, and DURHAM
SCHOOL SERVICES LP, d/b/a
DURHAM TRANSPORTATION,

                Defendants.
_____/

OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANT ANN ARBOR
<u>PUBLIC SCHOOLS' MOTION TO DISMISS (ECF No. 21)</u>

      Plaintiff Jaime Nelson-Molnar (Nelson) filed this action individually

and as next friend of her son J.W. against defendants Ann Arbor Public

Schools (AAPS or the District), Michael Johnson, and Durham School

Services LP, d/b/a Durham Transportation (Durham). Plaintiffs allege

defendants created a dangerous environment in which J.W., Nelson's

seven-year-old child who is autistic and emotionally impaired, was

repeatedly physically and verbally abused by a school bus aide. The matter

is before the Court on AAPS's motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim against the District for violating plaintiffs' due process rights under the Fourteenth Amendment (Count II), discrimination in violation of the Americans with Disabilities Act (Count IV) and Section 504 of the Rehabilitation Act (Count V), disability discrimination under Michigan's Persons with Disabilities Civil Rights Act (Count VI), failure to report child abuse under Michigan Child Protection Law (Count VII), and intentional infliction of emotional distress (Count VIII).[1]

Upon a careful review of the written submissions, the Court deems it appropriate to render its decision without a hearing pursuant to Local Rule 7.1(f)(2). For the reasons set forth below, defendant's motion to dismiss is granted in part and denied in part.

## FACTUAL BACKGROUND[2]

J.W. has been diagnosed as autistic and emotionally impaired. Based on his disability, AAPS recommended J.W. for Carpenter Elementary School's Emotionally Impaired Self-Contained Classroom (EISCC). For transportation home from school, AAPS assigned J.W. to Bus 17, which

---

[1] Defendants Johnson and Durham have not filed motions to dismiss.
[2] The factual background is taken from the allegations in plaintiffs' complaint (ECF No. 1).

was dedicated for children with special needs. Bus 17 was operated by defendant Durham, and Rochanda Jefferson was the assigned bus aide.

Prior to J.W. being assigned to Bus 17, AAPS and Durham had notice of prior incidents of bus staff assaulting children with disabilities. For example, a police report was filed regarding an incident on October 18, 2016 in which an AAPS/Durham bus aide hit a disabled child in the stomach after the child swatted at him. AAPS and Durham had also received prior complains that Jefferson behaved in a way that was threatening and aggressive.

On December 6, 2021, J.W. started second grade at Carpenter. When the bus dropped J.W. off at his house after his first day of school, bus aide Jefferson got off the bus and told Nelson that J.W. "swung out at me and I can't hit him, so I don't know what you want me to do." Nelson asked Jefferson if anyone had talked to her about J.W.'s special education needs, and Jefferson said no.

The next day, Nelson called J.W.'s classroom teacher, Sara Operacz, to inform her of the bus incident and ask the school to talk with the bus provider. Shortly afterwards, Operacz told Nelson that she reported the incident to Principal Michael Johnson. Operacz also told Nelson that she observed escalated behavioral issues for J.W. at the end of the day when

he anticipated having to ride the bus. On December 13, 2021, Nelson

texted Johnson asking his opinion about continuing to have J.W. ride the

bus. Johnson responded that J.W. should ride the bus and told Nelson not

to tell any teachers.

On Tuesday, December 14, 2021, at approximately 4:30 pm, Nelson

received a phone call from the AAPS Transportation Dispatch. The

dispatcher said that J.W. was having behavioral issues on the bus and that

Nelson may need to pick him up. Video from Bus 17 from December 14,

2021 allegedly shows that J.W. moved between different seats and crawled

onto the floor while the bus was in motion. J.W. swiped his arm at Jefferson

and Jefferson audibly responding: "I'm gonna hit you back. . . . I whoop

kids." J.W. ran to the back of the bus where he sat for several minutes. The

bus driver stopped the bus and attempted to carry J.W. from the back of

the bus to his original seat at the front, where Jefferson had set up a star

harness to restrain J.W.[3] Jefferson took J.W. from the bus driver and

carried him by his arms to the front of the bus. J.W. began to scream and

flail his arms. Jefferson attempted to force J.W. into the STAR harness,

---

[3] Under Michigan law, the "star harness" is restricted for emergency use where a student's behavior poses an imminent risk to their own safety or the safety of others. MCL 380.1307 et seq. Using the star harness for J.W. was in violation of his individualized education plan (IEP) with the school district.

only partially restraining him. The video allegedly shows J.W. screaming in the harness, while Jefferson hits him repeatedly.

At approximately 5:00 pm, the bus arrived at Nelson's house. Nelson was standing outside to meet J.W., unaware what had transpired on the bus. J.W. ran off the bus, past Nelson, into the house, and locked the door. J.W. hid behind the front door sobbing. The next day, multiple Carpenter students reported to a teacher and a social worker at AAPS that they saw Jefferson hit J.W. on the bus. The social worker took witness interviews and wrote reports about the incident and gave them to Johnson.

On December 15, AAPS Transportation Dispatch called Nelson and instructed her to pick J.W. up from the bus, which was about 10 minutes away from the house. When Nelson arrived, the bus was stopped on the side of the road and J.W. was inside the bus, banging on the door to get out. He was not wearing his shoes or coat and his belongings were strewn around the bus. J.W. was shaking and sweating. Nelson texted Operacz to inform her about the incident. Durham never reported the incident to AAPS.

On December 16, Operacz contacted Johnson about the December 14 assault on J.W. as reported by the students. Defendants did not document that J.W. was restrained in a star harness, did not report the December 14 assault to Child Protective Services, and did not notify

Nelson about the incident. Meanwhile, J.W. continued to ride the bus with Jefferson, who persisted in making threatening comments to J.W. On multiple occasions J.W. became distressed and Jefferson restrained him in a star harness.

On January 14 and 18, Operacz emailed Johnson again about the danger Jefferson posed to J.W. on the bus. On January 18, Operacz also sent an email to Johnson, administrator Terra Webster, and special education teacher Derek Gramza. The email stated in part:

> I am very concerned about this situation and the safety of our students. . . . I haven't received an update on the allegations that were shared. I am concerned that I am going to lose all credibility with mom when she finds out that I knew about these allegations and didn't tell her. I also don't feel comfortable keeping this from mom.

On January 19, Johnson sent an email to Nelson acknowledging "two incidents" on the bus that "resulted in unsafe conditions" for J.W. Johnson stated that he was aware of the allegations and requested an investigation from Durham in December. Audra Holdorf, Assistant Director of Student Intervention and Support Services for AAPS, was copied on Johnson's email and responded: "Thank you Carpenter team for working with the family and the staff to resolve this safety concern from the bus . . . Durham has retrieved the video and we are reviewing it to investigate." That evening, Operacz revealed to Nelson that some kind of assault had

occurred on the bus, as reported by multiple students. January 19 was the first time Nelson was informed that J.W. had been assaulted on the bus and that there was a video of the incidents.

Holdorf told Nelson that video taken December 15 did not show an assault on J.W. However, video from December 14, the date of the reported assault by Jefferson, was not reviewed. Nelson repeatedly asked to see the videos but her requests were denied. Based on Johnson's January 19, 2022 email, which stated there were two separate assaults on J.W., as well as J.W.'s statement to Nelson that Jefferson hit him more than one time, plaintiffs allege that between December 15, 2022 and January 19, 2022, Jefferson assaulted J.W. at least one additional time.

On January 24th, J.W. began riding with a new bus aide. That day, the bus driver apologized to Nelson and confirmed Jefferson was "rough" with J.W. By February 8, 2022, J.W. had ridden the bus with four different aides without incident.

Nelson did not discover the severity of the December 14 assault until April 2022 when she viewed the surveillance video with police. J.W. transferred to a new school on April 6, 2022. On June 28, 2023, following a bench trial in Washtenaw County 14A District Court, Jefferson was found

guilty of 4th degree child abuse for the December 14, 2022 assault on J.W.

*People v. Jefferson*, Case No. 2022-221-1481.

## STANDARD OF LAW

Rule 12(b)(6) allows the Court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted.  Under the Supreme Court's articulation of the Rule 12(b)(6) standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007), the court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims.  "'[N]aked assertions' devoid of 'further factual enhancement'" are insufficient to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557, 570).  To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide "'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).  Even though the complaint need not contain "detailed" factual allegations, its "'factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true.'"  *New*

*Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

## ANALYSIS

I.   State-Created Danger (Count II)

The Fourteenth Amendment provides that no state can deprive a person of life, liberty, or property without due process. U.S. Const. amend. XIV, § 1. However, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id*. at 197. An exception exists in instances where the State renders a person "more vulnerable to" the dangers to which he was exposed. *Id*. at 201. This is known as the state-created danger doctrine, which imposes a duty on the State to protect its citizens from risks of harm that are caused or greatly increased through its own affirmative acts. *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)).

To state a cause of action for a due process violation based on a "state created danger," plaintiffs must show three things. First, they must

show "an affirmative act by the state which either created or increased the risk that [they] would be exposed to an act of violence by a third party." Second, they must establish "a special danger to [them] wherein the state's actions placed [them] specifically at risk, as distinguished from a risk that affects the public at large." Third, they must show that the state was aware of the "substantial risk of serious harm" and responded in a way that was "conscience shocking." *M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 449 (6th Cir. 2021) (citations omitted).

In Count One, plaintiffs allege that Johnson and Durham are liable for violating J.W.'s due process rights under the state-created danger theory. In Count Two, plaintiffs allege that AAPS is also liable for the state-created danger by Johnson and Durham. To assert a state-created danger claim against a municipal entity such as AAPS, plaintiff must allege that the federal rights violation inflicted by the affirmative acts of Johnson and/or Durham occurred because of a municipal policy or custom. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Because the District can only be held liable for a violation of the Fourteenth Amendment under the state-created danger theory if there is a showing of liability on the part of its officials, the Court must first consider whether plaintiffs state a plausible claim against Johnson and/or Durham.

*Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 404 (6th Cir. 2010); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the [municipality's] officer, the fact that the [policy, practice, or custom] might have authorized the use of constitutionally excessive force is quite beside the point.").

A. Affirmative Act Plus Increased Risk

First, plaintiffs must plausibly allege that individual officials committed an affirmative act before each known assault that created or increased the risk that Jefferson would assault, or continue to assault, J.W. "Whether conduct amounts to an 'affirmative act' in this context is at times a difficult question." *Lipman v. Budish*, 974 F.3d 726, 744 (6th Cir. 2020) (citation omitted). "At one end of this spectrum, a failure to act is not enough." *Id.* When determining if there has been an affirmative act, courts often ask "whether [the victim] was safer *before* the state action than he was *after* it." *M.J. by & through S.J.*, 1 F.4th at 449 (citation omitted, emphasis in original). On a motion to dismiss, when the existence of an affirmative act is a "close call", courts construe the facts in favor of the plaintiff "as [courts] must at this stage of the litigation." *Id.*

Prior to the first assault of J.W., Johnson allegedly knew of at least one previous assault of a disabled child by another bus aide as a result of

improper training, had received prior complaints that Jefferson behaved in a way that was threatening and aggressive, and received a report from Operacz that Jefferson had exhibited inadequate training on J.W.'s first day of school. Johnson possessed this knowledge when he (a) advised Nelson by text message on December 13, 2021 to keep J.W. on the bus, (b) concealed the specific risks posed by Jefferson from Nelson and law enforcement, and (c) continued to assign Jefferson to Bus 17.

Before the second known assault of J.W., which allegedly took place between December 15, 2021 and January 19, 2022, Johnson received more information, including reports that multiple children witnessed Jefferson physically assault J.W. on the bus. Johnson continued to conceal the assault from Nelson, staff, and law enforcement, and continued to assign Jefferson to Bus 17 without providing her with any additional training. Johnson also failed to file a mandatory report of suspected child abuse or neglect in violation of MCL § 722.623(a).

The Court first considers whether Johnson's response to Nelson's text message asking whether J.W. should continue to ride the bus constitutes an affirmative act. AAPS argues that Johnson did not create or increase any risk of harm to J.W. by Jefferson by merely returning J.W. to the bus or advising Nelson to keep him on the bus. The Sixth Circuit

considered a similar argument in a case involving a principal who instructed students to board a school bus despite her knowledge that the bus driver was a dangerous driver. *M.S. by Covington v. Hamilton Cnty. Dep't of Educ.*, 756 F. App'x 510 (6th Cir. 2018). In that case, the court concluded that "whether the principal's act increased the danger to the students is precisely what is at issue." *Id* at 517.

The school principal advising a parent that their autistic child should continue to ride the bus with an aide that presents a known danger is an affirmative act for purposes of surviving a motion to dismiss. Johnson's actions potentially created or increased the risk of harm to J.W. by Jefferson if for no other reason than that J.W. became increasingly agitated at the end of the day when he had to ride the bus. Jefferson lacked proper training in how to calm J.W., so it was foreseeable that her physical and verbal responses would increase proportionately with his behavior. Plaintiffs have plausibly alleged that Johnson's response that J.W. should continue to ride the bus was an affirmative act.

Other acts identified by plaintiffs fall into the category of failing to act. This includes the allegation that Johnson concealed the risks posed by Jefferson from Nelson and law enforcement before both assaults, and that he declined or failed to file a mandatory report of suspected child abuse

before the second assault. The failure to investigate or report allegations of child abuse is not an affirmative act under the state-created danger exception. *Engler v. Arnold*, 862 F.3d 571, 576 (6th Cir. 2017) (affirming dismissal of plaintiff's substantive due process claim because plaintiff "failed to state a claim" where defendant's "inaction" of refusing to investigate or report allegations of abuse did not constitute an affirmative act). Johnson's failure to share information he received about Jefferson with Nelson and law enforcement is also not an affirmative act.

Another act identified by plaintiffs is Johnson continued to assign Jefferson to Bus 17. Plaintiffs argue Johnson had the authority to direct that Jefferson be removed, trained or transferred from Bus 17. Nevertheless, Johnson continued to knowingly staff the bus dedicated to transporting children with special needs and disabilities with an aide who displayed no comprehension how to interact with them and a history of making violent threats toward the children. However, not removing Johnson from Bus 17 is just another example of a failure to act, which does not rise to the level of an affirmative act.

The allegations made against Durham all fall into the category of failing to act. For example, Durham did not remove Jefferson from Bus 17 despite knowledge of the December 14 assault and having the authority to

do so. The same is true of the allegation that Durham acted in concert with Johnson to conceal the assault from Nelson and law enforcement, and mislead Nelson to believe J.W. was safe on the bus. The complaint does not contain any allegations that Durham committed an affirmative act

B. Special Danger

A "special danger" exists where the "state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 468 (6th Cir. 2006). Plaintiffs allege the "actions of Defendants Johnson and Durham created a special danger to the children riding Bus 17, especially J.W., who Defendants knew to be the target of Jefferson's harassment and assault." Defendant argues that plaintiffs do not limit their allegations to J.W., but expands them to include all children riding Bus 17. The Court disagrees with this argument. Although any of the children could have been injured by Jefferson, plaintiffs sufficiently plead that Johnson knew Jefferson was at risk of harming J.W. in particular.

C. Requisite Culpability

The third prong of the state-created danger doctrine requires plaintiffs to show the requisite state culpability for a Due Process Clause violation. This requires a showing of at least deliberate indifference. "The

government's conduct must be so egregious that it can be said to be arbitrary in the constitutional sense." *M.J. by & through S.J.*, 1 F.4th at 450 (quoting *McQueen*, 433 F.3d at 469). The bar is higher than mere negligence, "only extreme misconduct"—conduct that shocks the conscience—"will violate the [Due Process] clause." *Id*. (quoting *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932 (6th Cir. 2020)).

The requisite culpability exists where a state official is aware of facts from which he draws the inference of the specific risk that later develops. "[H]aving drawn the inference, the official must act or fail to act in a manner demonstrating reckless or callous indifference toward the individual's rights." *Jane Doe*, 954 F.3d at 933-34. Plaintiffs allege that Johnson received sufficient warnings that J.W. was in danger of harm at the hands of Jefferson such that it was conscience-shocking for Johnson to advise Nelson that J.W. should continue to ride the bus.

At the motion to dismiss stage, the Court concludes that plaintiffs have alleged a plausible due process violation under the state-created danger doctrine based on Johnson telling Nelson that J.W. should continue to ride the bus.

D. *Monell* Claim Policies, Custom, and Practices

A local government can be sued under § 1983 only when a policy or custom of that government caused the injury in question. *Monell*, 436 U.S. at 694. Here, plaintiffs must allege that the federal rights violation inflicted by the affirmative act of Johnson – telling Nelson that J.W. should continue to ride the bus - occurred because of a municipal policy or custom. There are four ways a plaintiff can demonstrate such a policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decisionmaking authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Lipman*, 974 F.3d at 747 (citation omitted).

Plaintiffs allege that AAPS and its administrators and policymakers, including Johnson, acting in concert with Durham, adopted polices, practices and customs that were inadequate to keep J.W. safe on the school bus, were the moving force behind Jefferson's assaults of J.W., and caused plaintiff's constitutional injuries. These include a policy, practice or custom of: (1) failure to train bus staff on effective and appropriate communication and discipline methods for students with special needs; (2) concealment of known risks of abuse of special education children on the

bus; and (3) declining to file mandatory reports of suspected child abuse or neglect and discouraging AAPS staff from making such reports.

The Sixth Circuit summarized what must be proven for *Monell* liability against a school district:

> To recap, [plaintiff] must also show that there was a clear and persistent pattern of that unconstitutional activity, that the District knew about that pattern, that the District deliberately ignored that pattern, and that the District's ignoring the pattern of unconstitutional activity by the principal had a direct causal link to the deprivation of the students' rights.

*M.S. by Covington*, 756 F. App'x. at 518 (citing *Doe v. Claiborne C*ty., 103 F.3d 495, 508 (6th Cir. 1996)). The court concluded that where the principal was alleged to have deprived plaintiffs of their constitutional rights by directing the students onto the bus "every school-day afternoon between early November and November 21, or approximately fifteen times," that many instances of unconstitutional activity could amount to a pattern of unconstitutional activity for purposes of surviving a motion to dismiss. *Id*. at 517.

The issue before this Court is also whether AAPS had a policy, practice or custom of concealing known risks of abuse of special education children on the bus. Plaintiffs allege that Johnson committed one affirmative act of telling Nelson that J.W. should continue to ride the bus, as opposed to the multiple repeated acts described in *M.S. by Covington*. One

- 18 -

instance does not form a clear pattern of unconstitutional activity. And while plaintiffs also allege policies of inadequate training and declining to file mandatory reports of suspected child abuse, those alleged policies are not relevant to the analysis because they did not enable the affirmative act that forms the unconstitutional activity in this case.

Count Two alleging municipal liability against AAPS is dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

II.    ADA (Count IV) and Section 504 Rehabilitation Act (Count V)

Plaintiffs allege that J.W. was denied the benefits of attending the EISCC program at Carpenter, which included riding a school bus dedicated to children participating in special education programs at AAPS. Plaintiffs contend that J.W. was forced to transfer schools because of the assaults and harassment he received from the bus aide because of his disability. Plaintiffs allege that AAPS thus violated the ADA and the Rehabilitation Act by discriminating against J.W. and excluding him from participation in the EISCC program, a public program that receives Federal financial assistance, solely by reason of his disability.

Defendant AAPS does not dispute that plaintiffs state a plausible prima facie discrimination claim under the ADA and Rehabilitation Act. Instead, AAPS moves for dismissal based on the failure to exhaust

administrative remedies. AAPS argues that plaintiffs' failure to exhaust administrative remedies under the Individuals with Disabilities Education Act (IDEA) bars the federal civil rights claims under the ADA and Rehabilitation Act.

The IDEA requires plaintiffs to exhaust their administrative remedies before bringing a suit in federal court seeking relief that is also available under the ADA and Rehabilitation Act. *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 150 (2023). "The IDEA guarantees individually tailored educational services for children with disabilities, while Title II (ADA) and § 504 (Rehabilitation Act) promise nondiscriminatory access to public institutions for people with disabilities of all ages." *Id.* AAPS maintains that to the extent plaintiffs' claims relate to the provision of J.W.'s education, that is the denial of the federally established right to a "free and appropriate public education," plaintiffs are required to first exhaust those claims through the administrative process.

To answer the question of whether plaintiffs were required to exhaust prior to bringing this suit, the court looks to the gravamen of the complaint. *Fry v. Napoleon Cmty. Sch.*, 580, U.S. 154, 155 (2017). One "clue" to determining the gravamen is to ask "first, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public

facility that was not a school? Second, could an adult at the school have pressed essentially the same grievance?" *Id*. 156. "When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE [Free and Appropriate Public Education] is also unlikely to be truly about that subject." *Id*.

Plaintiffs contend that this suit is not about his need for "individually tailored educational services," rather it is about an assault motivated by animus to students with disabilities. A student's ability to ride the school bus home without being assaulted is not a "unique need" that could be resolved with an improved IEP; it is a universal need for all children, whether they use an IEP or not. Therefore, plaintiffs argue essentially the same claim could be made against a public bus company if the incident occurred on a city bus.

Plaintiffs seeks monetary damages, as opposed to equitable relief, and the IDEA does not provide for monetary damages. *See Luna Perez*, 598 U.S. at 147-48. Defendant argues that plaintiffs attempt to circumvent the exhaustion requirement by emphasizing monetary damages, while really seeking redress for the school's failure to provide J.W. with a FAPE. It is true that plaintiffs contend that due to the discriminatory treatment J.W. received, he was forced to leave the EISCC program, thereby being denied

the benefits of that program. However, the crux of these claims is about assault and discrimination motivated by a disability rather than the denial of individually tailored educational services.

In addition, as J.W. no longer attends AAPS, requiring exhaustion of administrative remedies in the hope that could provide sufficient relief to the injured party would be futile. *See Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 917 (6th Cir. 2000) (finding futility where student had graduated, injuries were in the past, and money damages were the only remedy that could make him whole).

The substance of plaintiffs' complaint is not the failure to provide FAPE. Therefore, plaintiffs need not exhaust their administrative remedies under the IDEA before bringing the ADA and Rehabilitation Act claims. The Court denies defendant's motion to dismiss Counts IV and V for failure to exhaust.

III.    <u>PWDCRA Discrimination (Count VI)</u>

Defendant moves to dismiss plaintiffs' PWDCRA discrimination claim on the basis that it is preempted by the Michigan Mandatory Special Education Act (MMSEA). "Michigan courts have held that the comprehensive scheme of MMSEA preempts claims arising under the PWDCRA, if the claims relate to a student's education, because the latter

statute addresses disabilities more generally than does the MMSEA, which targets specifically educational disabilities." *Griffin v. Sanders*, No. 11-CV-12289, 2013 WL 3788826, at *10 (E.D. Mich. July 19, 2013) (citing *Miller ex rel. Miller v. Lord,* 686 N.W.2d 800, 803 (Mich. Ct. App. 2004)). Claims relating to an IEP relate to a student's education and must be brought under the MMSEA. *Id*. Defendant argues that plaintiffs connect the assaults he suffered on the bus with the denial of an educational opportunity, therefore his claim is preempted.

Plaintiffs' PWDCRA claim against defendant AAPS alleges that J.W. was denied the benefits of educational opportunities and transportation services he was qualified to receive because the District discriminated against him based on his disability. The allegation that AAPS facilitated and concealed J.W.'s abuse by the bus aide has nothing to do with his unique educational needs or his IEP. Instead, the claim is that AAPS provides safe transportation for non-disabled students but required J.W. to endure physical assault on the school bus, thus denying J.W. an equal opportunity to access education and public services. Plaintiffs' PWDCRA claim is not preempted by the MMSEA and AAPS's motion to dismiss Count VI on that basis is denied.

IV.    <u>Governmental Immunity (Count VII, Count VIII)</u>

Under the Governmental Tort Immunity Act ("GTLA"), government agencies are immune from tort liability "if the governmental agency is engaged in the exercise of discharge of a governmental function." MCL 691.1407(1). School districts are political subdivisions of the state and are considered governmental agencies under GTLA. MCL 691.1401(a) and (e). A "governmental function" is defined as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." MCL 691.1407(b).

To avoid dismissal based on governmental immunity, a plaintiff must state a claim that fits within one of the narrow statutory exceptions or by pleading facts demonstrating the alleged tort occurred outside the exercise of a governmental function. *Odom v. Wayne Cnty.*, 482 Mich. 459, 478 (2008). "Placing this burden on the plaintiff relieves the government of the expense of discovery and trial in many cases." *Id*. at 479. The burden of proof with regard to governmental immunity differs for individuals, who bear the burden "to raise and prove [their] entitlement to immunity as an affirmative defense." *Id*.

A governmental agency, such as AAPS, "can be held vicariously liable only when its officer, employee, or agent, acting during the course of

employment and within the scope of authority, commits a tort while engaged in an activity which is nongovernmental or proprietary, or which falls within a statutory exception." *Guzall v. Michigan State Univ.*, No. 356768, 2022 WL 4586568, at *4 (Mich. Ct. App. Sept. 29, 2022) (quoting *Ross v Consumers Power Co (On Rehearing)*, 420 Mich. 567, 363 N.W.2d 641 (1984), superseded by statute on other grounds as stated in *Ray v Swager*, 501 Mich. 52, 81, 903 N.W.2d 366 (2017) (recognizing that the GTLA was amended after the *Ross* decision to create a narrow exception to qualified immunity for government actors)). "In contrast, if the agent is carrying out a governmental function, the agency is entitled to immunity." *Id*. Plaintiffs do not allege a statutory exception applies to its claims against AAPS.

A. Failure to Report Child Abuse

The Michigan Child Protection Law (CPL) provides that "[a] person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure." MCL § 722.633. Plaintiffs allege that each of the defendants failed to report the child abuse committed by Jefferson in violation of CPL where each "had reason to believe that J.W. was being subjected to serious physical or mental harm by Jefferson." Plaintiffs allege

that AAPS is vicariously liable for the harm that occurred to J.W. due to its agents' failure to report the suspected child abuse.

Plaintiffs first argue that AAPS is not immune from vicarious liability for violations of CPL because its liability is based on Johnson's gross negligence. Where gross negligence is the proximate cause of the injury, a municipal defendant has no immunity from vicarious liability under the mandatory reporting statute. *See Jones v. Bitner*, 300 Mich. App. 65, 77 (2013). Plaintiffs' theory is that Johnson's failure to report Jefferson's abuse was grossly negligent and was the proximate cause of the additional verbal and physical abuse inflicted on J.W.

Although the failure to report abuse might be *a* proximate cause of plaintiff's alleged injuries, it was not *the* proximate cause. *See id.* at p. 78. Johnson's email telling Nelson that J.W. should continue to ride the bus while Jefferson remained on the bus without any additional training was the proximate cause of plaintiffs' injuries.

Plaintiffs next argue AAPS is not immune from vicarious liable for the failure to report child abuse because by committing, facilitating, and concealing an intentional assault, Jefferson and Johnson were both "engaged in an activity which is nongovernmental." The CPL requires certain school personnel to report suspected child abuse under specified

- 26 -

circumstances. The individuals with a duty to report were necessarily acting within the scope of their authority and in the course of their employment when they failed to report. Plaintiffs' allegation that AAPS has vicarious liability for failing to report child abuse based on "nongovernmental acts" taken by individuals fails to state a claim for which AAPS is not immune.

For these reasons, the claim that AAPS failed to report child abuse as required by law, as alleged in Count Seven, is dismissed due to governmental immunity.

B. Intentional Infliction of Emotional Distress

In Count Eight plaintiffs allege that all defendants engaged in the tort of intentional infliction of emotional distress. The conduct defendants are accused of includes: ignoring warnings and actual notice that Jefferson was abusing and threatening J.W.; instructing Nelson that J.W. should continue riding the bus; keeping Jefferson on the bus without retraining; and concealing the assault from Nelson and law enforcement.

Plaintiffs allege that AAPS is vicariously liable for intentional infliction of emotional distress based on the acts of Johnson and Durham. However, "governmental agencies remain immune from liability unless the employee 'commits a tort while engaged in an activity which is nongovernmental or proprietary, or which falls within a statutory exception.'" *One by Monteleone*

*v. Macomb Cnty. Intermediate Sch. Dist.*, No. 360958, 2023 WL 2620416, at *5 (Mich. Ct. App. Mar. 23, 2023) (citation omitted). Plaintiffs have not plead facts demonstrating that the alleged tortious conduct occurred outside the exercise of a governmental function. Rather, the acts attributed to the defendants in Count Eight were allegedly committed during the course of their employment and within the scope of their authority.

AAPS is immune from liability for the tort of intentional infliction of emotional distress. Count Eight is therefore dismissed as to AAPS based on governmental immunity.

## V. Conclusion

For the reasons set forth above, defendant AAPS's motion to dismiss (ECF No. 21) is GRANTED as to Counts Two (state-created danger, *Monell*), Seven (failure to report child abuse), and Eight (intentional infliction of emotional distress) and DENIED as to Counts Four (discrimination in violation of ADA), Five (discrimination in violation of Rehabilitation Act), and Six (discrimination in violation of PWDCRA).

It is so ordered.

Dated:  May 8, 2024

                    s/George Caram Steeh
                    HON. GEORGE CARAM STEEH
                    UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record
on May 8, 2024, by electronic and/or ordinary mail.

s/Lashawn Saulsberry
Deputy Clerk